# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

---

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                  CR No.  98-297 JP

RODOLFO MACIAS-TREVISO and,
VICTOR GALLEGOS-GARCIA,

      Defendants.


## MEMORANDUM OPINION AND ORDER

On June 1, 1998, Defendant Macias-Treviso filed a "Motion to Suppress Evidence obtained after Illegal Search," (Doc. No. 32) and a Motion to Suppress Evidence," (Doc. No. 36).  On June 18, 1998, Defendant Macias-Treviso filed a "Motion to Supplement to Defendant's Motion to Suppress Evidence Obtained After Illegal Search filed on June 1, 1998," (Doc. No. 49) which essentially superceded the two motions to suppress evidence filed on June 1, 1998.[1]  The parties presented evidence on August 17, 1998, at a hearing on these motions.  On September 15, 1998, Defendant Macias-Treviso and Co-Defendant Gallegos-Garcia filed a "Joint Memorandum in Support of Suppression of Evidence Based On Hearing On August 17, 1998," (Doc. No. 85). A further evidentiary hearing was held on October 29, 1998.  After I requested supplemental briefing at the October 29, 1998, hearing, on November 9, 1998, the Government filed "Government's Brief Regarding Suppression of Contraband which was Control Delivered," (Doc.

---

[1]This opinion does not address Defendant Macias-Treviso's "Motion to Suppress Statements Obtained After Arrest," (Doc. No. 31), also filed on June 1, 1998.

No. 109), and on November 10, 1998, the Government filed a "Supplemental Memorandum,"

(Doc. No. 110). Defendant Macias-Treviso filed "Defendant Macias-Treviso's Second

Supplemental Brief in Support of Suppression of Evidence," (Doc. No. 115) on November 23,

1998. After thoroughly reviewing the motions, the briefs and the applicable case law, and after

holding two evidentiary hearings, I conclude that Defendant Macias-Treviso lacks standing to

bring a Fourth Amendment challenge to the Government's allegedly unlawful entry into the

garage on April 4, 1998, and the subsequent search and seizure on April 5, 1998, of evidence

from the garage and the Chevy Malibu parked in the garage. I also conclude that, even if

Defendant Macias-Treviso had standing, I would rule on the merits that all of the evidence, with

the exception of one of the cell phones and a pager, is admissible.

## I. BACKGROUND

This case began when a confidential informant ("CI") told U.S. Customs Agent John R.

Davis that the CI had been contacted by a drug source in Mexico identified only as "Pedro."

Pedro allegedly instructed the CI to deliver cocaine in Albuquerque to the same people who the

CI had contacted two weeks earlier in what apparently was a "dry run." With the government's

permission, the CI picked up a 1983 Chevy Malibu ("Malibu") containing approximately twenty-

five pounds of cocaine. Although no evidence was presented concerning where the CI took

possession of the Malibu, the government's attorney said that the CI picked up the Malibu on the

border at the Santa Teresa, New Mexico Port-of-Entry from the Republic of Mexico. (October

29, 1998, Tr. at 77) The Malibu was registered to Emilio Salazar of El Paso, Texas.

On April 3, 1998, at 6:15 p.m., the Malibu, driven by the CI, entered the United States

from Mexico through Santa Teresa. U.S. Customs Agent Davis testified that he had informed the

border patrol agents that a vehicle would be coming through with a load of cocaine. (Tr. at 133)[2] At the port-of-entry, a canine alerted to the back seat and floor area of the Malibu, but law enforcement officers were unable to find any contraband during a subsequent search of the vehicle. The agents knew that there was a compartment containing contraband somewhere in the vehicle, but the CI had not identified precisely where it was located. (Tr. at 135) The agents impounded the Malibu at the DEA impound lot in Las Cruces until the next morning to allow the odor of the contraband to grow stronger and enhance the canine's ability to pinpoint the location of the compartment. (Tr. at 133)

The next day, April 4, 1998, the Malibu was driven to Albuquerque.[3] While en route, law enforcement agents stopped the car at the I-25 Border Patrol Check Point north of Las Cruces. There, the government, with the assistance of "T-Rex," another drug-sniffing canine, located a hidden compartment in the trunk of the Malibu. (Tr. at 134) Agents gained enough access to the compartment only to verify that there was a metal container concealed in the trunk; agents did not remove any cocaine at that time. (Tr. at 134)

The Malibu was then driven to the U.S. Customs Office in Albuquerque where customs agents opened the hidden compartment and removed fourteen packages of cocaine, leaving two packages in the compartment. It is unclear whether the two packages were left in the compartment for the purpose of making a controlled delivery or whether they were left there

[2] Unless otherwise noted, all transcript references are from the transcript of the August 17, 1998, hearing.

[3] It is unclear whether the CI or an agent drove the Malibu from Las Cruces to Albuquerque. ("Supplement to Defendant's Motion to Suppress Evidence Obtained after Illegal Search Filed on June 1, 1998" at 3)

because it was too difficult to remove them. (Tr. at 34, 136) Agents fixed the trunk lid lock in such a way that it could not be opened with a key.

The CI then left the U.S. Customs Office in the Malibu, which agents kept under surveillance. At approximately 1:30, the CI called a telephone number that is not listed under Defendant Macias-Treviso's name. (Tr. at 36) A conversation ensued between the CI and another individual who the government contends was Defendant Macias-Treviso. During the telephone conversation, the CI said he was in Albuquerque and waiting for the other person. (Tr. at 37) Drugs were not discussed during the conversation and Defendant Macias-Treviso was not mentioned by name. (Tr. at 37)

Defendant Macias-Treviso and the CI then met at a gas station. (Tr. at 37) Defendant Macias-Treviso left the gas station in a car driven by another person, and the CI followed in the Malibu. (Tr. at 38) The two vehicles stopped at a residence at 2539 Franzen, in southwest Albuquerque. (Tr. at 38) After leaving the Malibu parked in front of the 2539 Franzen residence, Defendant Macias-Treviso and an unidentified woman drove the CI in a Toyota Camry to the Albuquerque International Airport where agents claim to have observed Defendant Macias-Treviso either purchase a plane ticket for the CI to travel to El Paso, Texas, or give the CI money to purchase a ticket to El Paso, Texas. (Tr. at 40, 43) During this time, agents maintained their surveillance at the Franzen residence. (Tr. at 39)

At approximately 5:30 P.M. agents observed a light blue Honda Accord with Arizona license plate number NEA602 arrive at 2539 Franzen and Defendant Macias-Treviso and a small boy get

out of the Honda.[4]  (Tr. at 43)  Defendant Macias-Treviso and the boy then entered the Malibu

and departed for Autozone. (Tr. at 42) At the Autozone, agents observed Defendant Macias-

Treviso attempting to open the trunk of the Malibu.  (Tr. at 45) Because agents had rigged the

trunk lock so it could not be opened with a key, Defendant Macias-Treviso was unsuccessful in

his attempt to open the trunk at that point.

Agents then saw Defendant Macias-Treviso leave the Autozone in the Malibu and stop at

a gas station where he made a call on his cellular phone.  (Tr. at 46)  After Defendant Macias-

Treviso left the gas station, law enforcement agents who had been following him lost sight of

Defendant Macias-Treviso and the Malibu in traffic.  Approximately twenty minutes later,[5] at 6:35

P.M., officers on air surveillance spotted the Malibu "going into" the premises of 6 Clearview

Lane, in Cerro Mission, Valencia County, New Mexico.[6]  (Tr. at 62) The officers on air

surveillance reported the Malibu's location to ground crews, and some agents in cars immediately

proceeded to 6 Clearview Lane.  (Tr. at 62)

At the August 17, 1998, hearing, Defendant Macias-Treviso testified that the buildings at

6 Clearview Lane, consisting of a vacant house and a detached garage, belonged to his brother.

---

[4] No one presented any evidence indicating what Defendant Macias-Treviso did between
the time he dropped the CI off at the airport and the time he arrived at 2539 Franzen at
approximately 5:30 P.M, or whether Defendant Macias-Treviso was under surveillance during this
time.  (Tr. at 39-41)

[5] Defendant Macias-Treviso's testimony regarding the time of his arrival at 6 Clearview
Lane, the time of Defendant Gallegos-Garcia's arrival at the garage, and the time of the agents'
entry into the garage varies somewhat from Agent Cerda's testimony.  (Tr. at 95-96)

[6] It is unclear whether the proper spelling of the street name is "Clearview," "Clareview,"
of "Clairview," because these three different spellings appear in the briefs and transcripts.
"Clearview" is used in this opinion because that is how it appears in the transcripts of the August
17, 1998, hearing and the October 29, 1998, hearing.

(Tr. at 94.)  At the time of Defendants' arrest on April 4, 1998, no one was living in the house, which was still under construction and had not been occupied.  (Tr. at 94-95)  Defendant Macias-Treviso had his brother's permission to use the garage to do auto mechanic work and Defendant Macias-Treviso kept his tools there.  (Tr. at 95)  The garage is approximately fifty to ninety feet from the house and had no plumbing, but did have electricity. (October 29, 1998, Tr. at 4-5) Defendant Macias-Treviso had not been paying the electric bill for service to the garage.  (Tr. at 100)  Inside the garage were two rooms containing tools, a motor, a car seat, a floor safe, and a nonfunctional hot tub.  (October 29, 1998, Tr. at 4-7)  Defendant Macias-Treviso was the only one, besides his brother, who had a key to the garage, and Defendant Macias-Treviso had been using the garage for almost a year.  (Tr. at 99-100).  There was no testimony that the garage contained any beds or sleeping area, or that Defendant Macias-Treviso kept any clothes, other personal belongings, or food in the garage.

Around 6:55 P.M., which was approximately twenty to thirty minutes after Defendant Macias-Treviso arrived at 6 Clearview Lane, air surveillance reported to ground crews that another vehicle had arrived at 6 Clearview Lane.  (Tr. at 63) This vehicle turned out to be a dark blue Honda Accord with Arizona license plate number LZB821, which was driven by Defendant Gallegos-Garcia.[7]  At approximately 7:00 P.M., ground crew agents arrived at 6 Clearview Lane, and at approximately 7:15 PM agents made a warrantless entry into the garage and arrested the Defendants.  (Tr. at 62-63)  Defendant Macias-Treviso's son was asleep in the Malibu.  Agents observed a large amount of cash scattered in the passenger compartment of the Malibu.  (Tr. at

---

[7] The Honda Accord Defendant Gallegos-Garcia was driving was not the same Honda Accord Defendant Macias-Treviso had previously been driving.

68)  Agents also observed two cell phones in the garage, which seem to have been in plain view, although the testimony about this was somewhat confusing.  (Tr. at 68, 81)  The trunk lid of the Malibu had been opened by removing the trunk lid lock.

At 12:15 AM on April 5, 1998, five hours after agents had first entered the garage, the government agents obtained a search warrant for the garage, the Malibu, and the dark blue Honda Accord that Defendant Gallegos-Garcia had been driving.  Agents then searched the garage and the Malibu and found the two packages of cocaine they already knew were in the hidden compartment in the trunk, the $6,830 in cash they had already observed scattered around the passenger compartment of the Malibu, the two cell phones that had apparently already been seen when they entered the garage, and a pager.

At the August 17, 1998, hearing Defendant Macias-Treviso testified that the CI, who he knew as "Ray," had asked him to repair the Malibu, and that "Ray" told Defendant Macias-Treviso that he would pick it up either Sunday or Monday.  (Tr. at 101-102)

Defendants Macias-Treviso and Gallegos-Garcia were indicted for conspiracy to commit the offense of possession with intent to distribute more than 5 kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), 21 U.S.C. § 846, and 18 U.S.C. § 2, and for possessing with the intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C) and 18 U.S.C. § 2.

## II.    ANALYSIS

Defendant Macias-Treviso seeks to suppress all evidence seized as a result of the warrantless entry into the garage; any observations of the agents who entered the garage, including agents' observations of Defendant Macias-Treviso's comportment and demeanor at the time of the entry

into the garage and immediately thereafter; and any evidence obtained directly or indirectly as a result of the allegedly unlawful entry into the garage. ("Supplement to Defendant's Motion to Suppress Evidence Obtained after Illegal Search," at 1) The evidence seized from the garage and the Malibu consists of two cell phones found in or near the Malibu, two bundles of cocaine in the hidden compartment of the Malibu's trunk, cash scattered in the passenger compartment of the Malibu, and a pager. ("Joint Memorandum In Support of Suppression of Evidence Based on Hearing on August 17, 1998")

Standing to challenge search and seizures "is a matter of substantive fourth amendment law." *United States v. Rubio-Rivera*, 917 F.2d 1271, 1274 (10th Cir. 1990). "[T]o claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable . . . ." *Minnesota v. Carter*, 1998 WL 823045, * 4 (U.S. December 1, 1998). Thus, "[s]tanding is analyzed based upon two factors: whether the individual, by his conduct[,] has exhibited an actual (subjective) expectation of privacy, and whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable." *Rubio-Rivera*, 917 F.2d at 1274 (internal quotations omitted). The totality of the circumstances determines whether a defendant has a legitimate expectation of privacy in place searched by the government. *See Rawlings v. Kentucky*, 448 U.S. 98, 104-106 (1980). "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1.

*A.*     *Defendant Macias-Treviso's Lack of Standing to Challenge the Search of the Garage*

Defendant Macias-Treviso claims that he has demonstrated a legitimate expectation of privacy that permits him to make a Fourth Amendment challenge to the search of the garage because he had helped in the construction of his brother's house, he had his brother's permission to use the garage, he had worked on cars in the garage and had stored his tools there for almost a year, and he was the only one using a key to the garage. ("Joint Memorandum In Support of Suppression of Evidence Based on Hearing on August 17, 1998").

In a very recent opinion, *Minnesota v. Carter*, 1998 WL 823045, * 5 (U.S. December 1, 1998), the United States Supreme Court held that defendants who rented an apartment for a short time solely for the purpose of packaging cocaine had no legitimate expectation of privacy, which negated their argument that the search violated their Fourth Amendment rights. The Court reviewed several earlier Supreme Court cases and concluded, "[t]hus an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is *merely present with the consent of the householder may not*." *Id*. (emphasis supplied). Applying these earlier Supreme Court cases to the case before it, the Court said, "the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder, all lead us to conclude that respondents' situation is closer to that of one simply permitted on the premises," and, therefore, any search that occurred did not violate the defendants' Fourth Amendment rights. *Id*. at *6.

Although Defendant Macias-Treviso has shown that he had his brother's permission to use the garage to work on cars, Defendant Macias-Treviso has not demonstrated that he was ever an overnight guest in either the home or the detached garage. The garage lacked any plumbing and

there was no evidence that the garage contained a bed or sleeping area, cooking utensils or food, or any personal effects of Defendant Macias-Treviso such as clothes or toiletries. Moreover, Defendant Macias-Treviso testified that as of April 4, 1998, the house was still under construction and remained unoccupied. Defendant Macias-Treviso could not have been his brother's overnight guest at 6 Clearview Lane because his brother did not live at 6 Clearview Lane, and because there was no evidence that Defendant Macias-Treviso had ever spent the night in either the house or the garage.

Defendant Macias-Treviso's testimony indicates he used the garage for commercial purposes. He testified that he used the garage "to do auto mechanics," (Tr. at 95), that he had rebuilt a motor in the garage, (Tr. at 95), and that the cars parked outside the garage were ones on which he had worked. (Tr. at 95) Also, Defendant Macias-Treviso testified that he was supposed to be fixing the Malibu for "Ray." (Tr. at 102) These facts lead to the conclusion that Defendant Macias-Treviso was using the garage for commercial purposes. "Property used for commercial purposes is treated differently for Fourth Amendment purposes than residential property," and a person's expectation of privacy in commercial premises is less than an expectation of privacy in his or her home. *Minnesota v. Carter*, 1998 WL 823045 at *5 (citing *New York v. Burger*, 482 U.S. 691 (1987)). Defendant Macias-Treviso's expectation of privacy in the garage, which he used for commercial purposes, was certainly less than his expectation of privacy in his own home or his brother's actual residence.

Based on the totality of the circumstances, I conclude that Defendant Macias-Treviso did not demonstrate that he had an actual subjective expectation of privacy in the garage, which is located fifty to ninety feet from his brother's unoccupied and unfinished house, or that his

expectation of privacy in the detached garage is one that society is prepared to recognize as reasonable. Therefore, any improper search of the garage did not violate Defendant Macias-Treviso's personal Fourth Amendment rights because Defendant Macias-Treviso lacked standing to challenge the search of the garage.

B. *Defendant Macias-Treviso's Lack of Standing to Challenge the Search of the Malibu*

Defendant Macias-Treviso also challenges the search of the Malibu and seeks to suppress evidence officers found in it. This evidence includes the cash that agents observed scattered in the passenger compartment when they entered the garage, the two packages of cocaine in the hidden compartment in the trunk, a cell phone that was inside the Malibu, and possibly another cell phone and a pager.[8]

To demonstrate that the search of the Malibu infringed upon Defendant Macias-Treviso's Fourth Amendment rights, Defendant Macias-Treviso must show that he had an actual subjective expectation of privacy in the Malibu and that his expectation of privacy was objectively reasonable. *United States v. Gama-Bastias*, 142 F.3d 1233, 1239 (10th Cir. 1998). Defendant Macias-Treviso testified that the CI, "Ray," brought the Malibu to Defendant Macias-Treviso for the purpose of having Defendant Macias-Treviso make repairs to the car. (Tr. at 101-102.) According to his testimony, Defendant Macias-Treviso did not know "Ray," *id*, although Defendant Macias-Treviso had met "Ray" two weeks before April 4, 1998. (Tr. at 107-108) Defendant Macias-Treviso did not know who owned the car. (Tr. at 102) Although "Ray" did not give Defendant Macias-Treviso a phone number, "Ray" said he would be back the next day,

---

[8] At least one of the cell phones was found in the Malibu, but it is unclear where the other cell phone or the pager was found. (Tr. at 68, 112).

Sunday, or on Monday to pick up the car. *Id.* There was no testimony that the CI, "Ray,"

directed Defendant Macias-Treviso to any papers that would indicate that the CI, "Ray," was the

owner of the vehicle or that "Ray" had lawful possession of the vehicle. The government did not

dispute that the CI, "Ray," delivered lawful possession of the Malibu to Defendant Macias-

Treviso, although the government asserts that the Malibu was registered to Emilio Salazar of El

Paso, Texas.

First, Defendant Macias-Treviso failed to demonstrate that he actually had a subjective

expectation of privacy in the Malibu. He testified that he did not know who owned the Malibu,

which he expected to possess for a maximum of two days for the sole purpose of making

unspecified repairs to it, at the request of a person he did not know, because the car had been

stalling. (Tr. at 102, 108) Defendant Macias-Treviso did not testify that he actually had an

expectation of privacy in the Malibu. The task of repairing a car, or driving a car to a garage to

be repaired, is not one in which individuals usually seek privacy. *See United States v. Conway*, 73

F.3d 975, 979 (10th Cir. 1995) (considering "whether the task in which [the defendant] was

engaged is one in which participants usually seek privacy" when evaluating the defendant's

standing to contest a search of a motel room).

Second, even if Defendant Macias-Treviso met his burden of showing a subjective

expectation of privacy in the Malibu, he clearly failed to demonstrate that society would be

prepared to recognize that expectation of privacy as reasonable. Although Defendant Macias-

Treviso had possession of the Malibu at the time of his arrest, "[m]ere physical possession or

control of property is not sufficient to establish standing to object to a search of the property." *Id.*

(finding that the defendant had no standing to make a Fourth Amendment challenge to the search

of a motel room he occupied).  It is difficult to imagine that society would recognize as

reasonable a mechanic's personal subjective expectation of privacy in a vehicle that is briefly

entrusted to him by someone he does not know, who may or may not be the owner of the vehicle,

for the exclusive purpose of repairing it.

Some Tenth Circuit case law suggests that a defendant may have standing to challenge the

search of a vehicle borrowed from someone else.  *See United States v. Rubio-Rivera*, 917 F.2d

1271 (10th Cir. 1990) (borrower of vehicle may have sufficient possessory interest in vehicle to

support standing when apparent owner of the car directed the defendant to papers in the glove

compartment indicating ownership of the vehicle).  However, the facts in cases such as *Rubio-*

*Rivera* are distinguishable from those of this case.  Unlike the defendant in *Rubio-Rivera*,

Defendant Macias-Treviso offered no evidence that "Ray," directed him to any papers indicating

ownership of the vehicle or that "Ray" otherwise demonstrated that he was in lawful possession

of the Malibu.  The facts of this case are closer to those in *United States v. Arango*, 912 F.2d 441,

445-46 (10th Cir. 1990) in which the Tenth Circuit ruled that the defendant did not have a

reasonable expectation of privacy in the vehicle he was driving.  In *Arango*, the defendant testified

that he had borrowed the vehicle from someone he knew was not the owner, and the defendant

failed to present evidence that the registered owners had given lawful possession of the truck to

the person who loaned it to the defendant.  Like the defendant in *Arango*, Defendant Macias-

Treviso offered no evidence that the CI, "Ray," had lawful possession of the Malibu with the

permission of its registered owner.  And unlike the defendants in either *Rubio-Rivera* or *Arango*,

Defendant Macias-Treviso testified that he took possession of the car solely for the commercial

purpose of making mechanical repairs to it.

Because Defendant Macias-Treviso was entrusted with the Malibu for the purpose of repairing it, which is a commercial use, not a personal one, and because Defendant Macias-Treviso offered no evidence that he gained possession of the car from either the owner or someone who provided any indication that he was the lawful possessor of the Malibu, I conclude that Defendant Macias-Treviso does not have standing to make a Fourth Amendment challenge to the search of the Malibu.

C.    *Exigent Circumstances Justified the Warrantless Entry into the Garage*

Even if Defendant Macias-Treviso had standing to make a Fourth Amendment challenge to the agents' warrantless entry into the garage, exigent circumstances justified the entry without a warrant.

Searches and seizures that occur inside a home without a warrant are presumptively unreasonable. *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992). The government may only enter a home without a warrant when exigent circumstances exist.[9] The four requirements to justify a warrantless entry of a home when the police fear destruction of evidence are that it be:

> (1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse.

*United States v. Parra*, 2 F.3d 1058, 1064 (10th Cir.) *cert denied*, 510 U.S. 1026 (1993). In

---

[9] For reasons set forth in the standing section of this memorandum opinion and order, I am dubious that the garage could be considered a "home." Even if it were a home, as explained, *infra*, the warrantless entry was justified.

determining whether the government met its burden of showing exigent circumstances, this court

evaluates the circumstances as they would appear to "prudent, cautious and trained officers."

*Parra*, 2 F.3d at 1064 (internal quotations omitted).

The government essentially argues that exigent circumstances existed because of concerns

for officer safety, because the Defendants might flee, and because the Defendants might destroy

evidence or alert other co-conspirators to the investigation.[10]  Defendant Macias-Treviso contends

that there were no exigent circumstances because the Defendants were unarmed, they never

actually attempted to flee the property, and the government had more than ample time to obtain a

search warrant.  Defendant Macias-Treviso also argues that the indicators of exigency were

subject to police manipulation because Officer Cerda followed Defendant Macias-Treviso for

several hours without arresting him.

Defendant Macias-Treviso's arguments are unpersuasive.  The four requirements of

*Parra*, *supra*, were satisfied.  First, there was evidence establishing probable cause because

Defendant Macias-Treviso had taken control of the Malibu, which officers knew contained

contraband, and because officers had seen Defendant Macias-Treviso attempting to open the

trunk of the Malibu at the Autozone.  *See Parra*, 2 F.3d at 1064; *United States v. Scroger*, 98

---

[10]  In the government's brief, it articulated seven grounds for determining that exigent circumstances existed: (1) it would be immediately obvious to the Defendants that the trunk had been tampered with, which would alert them to law enforcement involvement, causing the Defendants to flee or destroy evidence; (2) the agents were unfamiliar with the area and it was dark; (3) agents did not know how many individuals exited the dark Blue Honda Accord; (4) a car approached with its light on and then turned them off as it entered the location; (5) the rural and isolated nature of the location would facilitate the flight of suspects and removal of evidence; (6) agents were aware that Defendant Macias-Treviso had a cell phone and could alert other co-conspirators that most of the contraband was missing; and (7) there were concerns for officer safety due to the darkness, the unfamiliarity with the location, and the uncertainty over the number of people in the garage.  ("Supplemental Memorandum," at 2-3)

F.3d 1256, 1259 (10th Cir. 1996) (finding probable cause under the first prong of the exigent circumstances analysis when defendant had stained fingers associated with methamphetamine and officers could smell contraband), *cert denied*, 117 S.Ct. 1324 (1997).  Second, conspiracy to commit the offense of possession with the intent to distribute cocaine, and possession with the intent to distribute cocaine, are serious crimes.  *See  Scroger*, 98 F.3d at 1260 (drug trafficking is a serious crime).  Third, the warrantless entry was properly limited in scope to ensure officer safety and to secure the garage, and the officers waited to search the garage and the Malibu until after they had obtained a federal search warrant.  *See id*.  Fourth, for reasons discussed below, there were indicators of exigency that were not subject to police manipulation or abuse.

At the October 29, 1998, hearing, Agent Cerda testified concerning the reasons for the warrantless entry into the garage.  It was getting dark outside and the agents did not know how many people were in the garage because they could not see how many people had arrived in the second car.  (Tr. at 15) The agents did not know if the suspects were armed.  (Tr. at 20)  The location was difficult to surveil because the agents would easily stand out in the area.  (Tr. at 16)  The property was approximately seventy-five feet by a hundred to a hundred and fifty feet and was surrounded by a 6-7 foot wall on three sides.  (Tr. at 16)  Behind the property was an open lot with access to two roads.  (Tr. at 17; Ct.'s Ex. # 7)  Although the area was fairly remote, it could be characterized as a checkerboard of vacant lots and residences.  (Ct.'s Ex. # 6,7)  Immediately to the south of the property are neighbors whose identity the agents did not know.  (Tr. at 22, 19)[11]

---

[11]  Although unknown to the officers at the time of the arrest, the neighbor who lives across the street from the property is a relative of Defendant Macias-Treviso.  (Tr. at 19)

Although there were five or six agents present on the premises and air surveillance overhead, the layout of the property, the character of the surrounding property, the agents' unfamiliarity with the neighborhood, and the approaching darkness, made it reasonable for the officers to fear that the suspects in the garage might flee from the garage, and might carry with them some of the contraband. (Tr. at 16; Ct's Ex. # 6,7) As Agent Cerda testified, the agents also feared the destruction of evidence. (Tr. at 16) At the time of the warrantless entry into the garage, the agents did not know whether the Defendants had means for destroying evidence, such as a toilet, a sink, a drain, or a vat of oil or tar. The agents' concern over the possible destruction of evidence appears to be reasonable.

The agents' concern over officer safety, prompted by the lack of information as to the number of suspects in the garage and whether they were armed, the approaching nightfall, and the dearth of information about the neighborhood, also was reasonable and provides further justification for the warrantless entry into the garage. Furthermore, the agents feared that Defendant Macias-Treviso might discover that the trunk had been tampered with and use the cell phone, which he had previously been observed to use, to alert other conspirators to the agents' presence. ("Supplemental Memorandum" at 3); *see Parra*, 2 F.3d at 1064 (finding that exigent circumstances justified a warrantless entry into a motel room when officers feared the destruction or movement of contraband, that suspects were prepared to flee, and that some suspects were aware of the officers' presence).

I have some concerns that these indicators of exigency were subject to police manipulation. *See Rico*, 51 F.3d at 502-506 (discussing manufactured exigent circumstances). Agent Cerda offered somewhat conflicting testimony regarding the existence of probable cause to

arrest Defendant Macias-Treviso prior to the warrantless entry into the garage. At one point, Agent Cerda testified that there was probable cause to arrest when Defendant Macias-Treviso took possession of the Malibu at the Franzen address earlier in the afternoon of April 4, 1998, although he chose not to arrest Defendant Macias-Treviso at that time. (Tr. at 69) At another point, Agent Cerda testified that there was insufficient evidence to arrest when Defendant Macias-Treviso attempted to open the trunk while at the Autozone. (Tr. at 45) However, Agent Cerda's decisions not to arrest at these times do not necessarily mean that the indicators of exigency surrounding the warrantless entry of the garage were subject to police manipulation or abuse.

Agent Cerda testified consistently about observations and events during the moments leading up to the warrantless entry. He testified that the Malibu was lost in traffic before air surveillance spotted it at approximately 6:35 PM when the Malibu arrived at 6 Clearview Lane. (Tr. at 61-62) Approximately twenty to thirty minutes after Defendant Macias-Treviso drove into the garage, air surveillance spotted Co-Defendant Gallegos-Garcia entering the garage. (Tr. at 63) Agent Cerda and the other officers did not arrive at 6 Clearview Lane until approximately 7:00 PM because they had been checking out other locations in Albuquerque when they were advised that air surveillance had spotted the Defendant, (Tr. at 62); and they then had to travel to 6 Clearview Lane, which is south of Albuquerque. The agents did not seek a warrant before their arrival at the scene because they were still attempting to reach the property "so [they] could take appropriate action then." (Tr. at 63) When asked if agents could have obtained a telephonic warrant after their arrival at the scene, Agent Cerda's response was equivocal and he stated that it was not his decision to make because he was not the case agent. (Tr. at 64) The agents entered the premises at approximately 7:15 P.M. (Tr. at 63)

Although there seems to have been at least a fifteen minute window during which the agents could have sought to obtain a telephonic warrant, this court "will not second-guess law enforcement tactics as long as those tactics are neither unreasonable nor employed with specific intent to create an emergency simply to circumvent the warrant requirement." *Rico*, 51 F.3d at 505. Because agents did not know in advance the location to which Defendant Macias-Treviso would be driving the Malibu, and because they had reasonable concerns about officer safety, the destruction of evidence, the warning of co-conspirators, and the possibility of the suspects' flight, I conclude that this is not an instance where the indicators of exigency were subject to police manipulation or abuse.

D.      *Additional Basis for Seizure of the Two Bundles of Cocaine–Illinois v. Andreas*

Defendant Macias-Treviso had no protected privacy interest in the Malibu's hidden compartment in which the cocaine was stored after agents had lawfully opened the compartment and had removed fourteen of the sixteen packages of cocaine in Albuquerque on April 4, 1998. It was at this time that agents actually "seized" the cocaine, and the two bundles left in the Malibu remained in the constructive possession of the government throughout the controlled delivery. *See Illinois v. Andreas*, 463 U.S. 765, 771 (1983) (holding that the warrantless reopening of a table containing marijuana, which was delivered to the respondent during a controlled delivery, did not violate respondent's Fourth Amendment rights). Grounding its decision on the plain-view doctrine, the *Andreas* court ruled that "once a container has been found to a certainty to contain illicit drugs, the contraband becomes like objects physically within the plain view of the police, and the claim to privacy is lost." *Id*. at 771-72. *See also United States v. Butler*, 904 F.2d 1482, 1485 (10th Cir.1990) (holding that officers did not need a warrant to reopen a jewelry box

containing contraband that defendant possessed as a result of a controlled delivery); *United States v. Andrews*, 618 F.2d 646, 652 (10th Cir.1980) (holding that a DEA agent at the termination of a controlled delivery was not required to obtain a search warrant before re-opening a package that had been lawfully opened at the beginning point of the controlled delivery and found to contain cocaine), *cert denied*, 449 U.S. 824 (1980); *United States v. Ford*, 525 F.2d 1308 (10th Cir.1975) (holding that contraband in a controlled delivery was "seized" in California and continued to be under the control of the government when it reached Oklahoma; thus, officers did not need to obtain a warrant before reopening the package in Oklahoma); *United States v. DeBerry*, 487 F.2d 448, 451 (2d Cir.1973) (holding that marijuana in a suitcase that was seized in New York and delivered to California as part of a controlled delivery "remained legally 'seized' just as much as if it were under the actual physical control of the police," so no warrant was required to re-open the suitcase in California).

Defendant Macias-Treviso argues that *Andreas* is distinguishable, and even supports the suppression of the cocaine, for three reasons. First, in *Andreas* officers arrested the defendant when he appeared to take possession of the contraband, but in this case agents did not arrest Defendant Macias-Treviso when he first took possession of the Malibu containing the contraband. Second, the defendant in *Andreas* did not contest the warrantless seizure of the container of contraband from the hallway outside his apartment, while Defendant Macias-Treviso does contest the warrantless entry into the garage. Third, the twenty minute gap in the agents' surveillance of Defendant Macias-Treviso revived his expectation of privacy in the Malibu. ("Joint Memorandum in Support of Suppression of Evidence Based on Hearing on August 17, 1998," at 19-21)

Defendant Macias-Treviso's argument that *Andreas* is distinguishable and supports his position is unconvincing. First, the officers in *Andreas* did not arrest the defendant when he first took possession of the delivery package containing marijuana in the common hallway of defendant's apartment building. In *Andreas*, officers posed as delivery men and left a package, which contained marijuana concealed in a wooden table, outside of the defendant's apartment door in a common hallway. The defendant pulled the package into his apartment and reemerged thirty to forty-five minutes later with the delivery package. At this time, officers arrested him. *Id.* at 767. Thus, the facts in *Andreas* are somewhat similar to those of this case, where agents elected not to immediately arrest Defendant Macias-Treviso when he took possession of the Malibu at the 2539 Franzen residence.

This case is also very similar to *United States v. Quintero*, 848 F.2d 154 (11th Cir. 1988). In *Quintero*, United States Customs officials discovered seven boxes of contraband in a cargo container at the Port of Miami. After officials made a controlled delivery to a warehouse, the defendant arrived at the warehouse and loaded the seven boxes into his van. *Id.* at 154. Agents kept the van under surveillance and eventually arrested the defendant. Without obtaining a warrant, agents also searched the seven boxes. The defendant challenged the admission into evidence of the contents of the boxes, but the Eleventh Circuit followed *Andreas* and held that the contents were properly admitted. The court reasoned that because the seven boxes had been under constant surveillance, there was no substantial likelihood that the contents of the boxes had been changed, and the defendant had no protected property interest in the contraband. *Id.* at 155.

Defendant Macias-Treviso's argument that the short gap in surveillance resurrected his expectation of privacy in the Malibu under *Andreas* also lacks merit. While the court in *Andreas*

held that an individual's expectation of privacy in a container may be recognized after an interruption in control or surveillance, the Court stated that this would not occur "absent a substantial likelihood that the contents have been changed . . . ." *Id.* at 772-73. Here, agents had rigged the Malibu's trunk lock so it would not open with a key, which would make it difficult for anyone to open the trunk and change the contents of the hidden compartment, and which evidently prevented Defendant Macias-Treviso from opening the trunk earlier at the Autozone. Also, the agents themselves had extreme difficulty opening the compartment at the United States Customs Office in Albuquerque before the CI drove the Malibu to 2539 Franzen. This suggests that it would have taken a long time to enter the hidden compartment once the trunk had been opened. Finally, it is highly unlikely that the contents of the compartment were altered in any way because during the twenty minute gap in surveillance Defendant Macias-Treviso drove the Malibu from a gas station in Albuquerque to 6 Clearview Lane in Valencia County, which is a considerable distance from the Albuquerque city limits. It would be extremely unlikely that Defendant Macias-Treviso, or anyone else, would have had time to open both the trunk and the hidden compartment in the trunk, and also change the contents of the compartment. Thus, in light of the distance Defendant Macias-Treviso traveled during the gap in surveillance, the fact that the trunk was rigged not to open with the trunk key, and the difficulty in accessing the compartment in the trunk, it is not substantially likely that the contents of the compartment in the trunk of the Malibu could have been changed during the twenty minute gap in surveillance. *See Butler*, 904 F.2d at 1486 (citing *Andreas* and concluding that "it was not substantially likely that [the defendant] changed the contents of the jewelry box during the break in surveillance.").

Although the government maintains constructive possession of contraband during a

controlled delivery, Defendant Macias-Treviso correctly points out "[t]his does not mean that the government should have the general right to make a warrantless search of a private warehouse or dwelling for the purpose of terminating a controlled delivery." *United States v. Singh*, 811 F.2d 758, 761 (2nd Cir. 1987), *cert denied*, 483 U.S. 1021 (1987). Here, however, agents made a warrantless entry into the garage that was justified by exigent circumstances. Once law enforcement agents were lawfully in the garage, they did not need a search warrant to take possession of the cocaine, which actually had been seized earlier in Albuquerque and remained in the government's constructive possession and in the agents' plain view. *See Andreas* 463 U.S. at 771-72 ("[O]nce a container has been found to a certainty to contain illicit drugs, the contraband becomes like objects physically within the plain view of the police, and the claim to privacy is lost.").

I conclude that Defendant Macias-Treviso did not have an expectation of privacy in the cocaine, which remained in the constructive possession of the government from the time it was first "seized" by agents in Albuquerque around noon on April 4, 1998.


IT IS THEREFORE ORDERED that Defendant Macias-Treviso "Motion to Suppress Evidence obtained after Illegal Search," (Doc. No. 32); "Motion to Suppress Evidence," (Doc. No. 36); and "Supplement to Defendant's Motion to Suppress Evidence Obtained After Illegal Search filed on June 1, 1998," (Doc. No. 49) are DENIED.

_____

UNITED STATES DISTRICT JUDGE